Elizabeth Ann Naylor and Ronald Stephen Owens
11440 N. 69th Street
Scottsdale, Arizona 85254
*Debtors in Pro Se*

IN THE UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF ARIZONA

In re:
ELIZABETH ANN NAYLOR and
RONALD STEPHEN OWENS,
                Debtors

Case No. 2:26-bk-05144-MCW
Chapter 11
Honorable Madeleine C. Wanslee

**EMERGENCY MOTION OF DEBTORS-IN-POSSESSION TO EXTEND
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(c)(3)(B)**
*(Companion Motion for Expedited Hearing Filed Concurrently — Hearing Required Before
June 21, 2026)*

**I.  INTRODUCTION**

Debtors Elizabeth Ann Naylor and Ronald Stephen Owens, appearing pro se as Debtors-in-Possession, move this Court pursuant to 11 U.S.C. § 362(c)(3)(B) to extend the automatic stay as to all creditors for the duration of this Chapter 11 case. Because a prior Chapter 13 case was dismissed within the preceding year, the automatic stay will terminate by operation of law on June 21, 2026 unless this Court enters an order extending it before that date. A Trustee's Sale of Debtors' primary residence has been scheduled for July 28, 2026. If the stay terminates on June 21, that sale may proceed without further Court action. The prior Chapter 13 case, Case No. 2:25-bk-07596-PS, was dismissed on January 26, 2026 while Debtors were actively seeking to correct the issues the Trustee had identified. The Chapter 13 Trustee's December 8, 2025 Recommendation expressly stated that the plan could be confirmed subject to identified conditions — this was a fixable case. Debtors sent written

requests to prior counsel on January 22, 2026 asking that he file an objection to the Trustee's motion to dismiss and a motion to extend time so that the identified deficiencies could be remedied. Prior counsel had received the Trustee's Notice of Intent to Lodge Dismissal Order on January 13, 2026 — thirteen days before dismissal — and did not respond to Debtors' January 22 written requests before the January 26, 2026 dismissal. No objection was filed. No motion to extend time was filed. The written record of those requests and of prior counsel's non-response is available upon request.

The current Chapter 11 case is filed in good faith, for a legitimate reorganization purpose, with documented income sufficient to fund a confirmable plan. Select Portfolio Servicing, Inc. ("SPS"), the servicer for the first deed of trust, has itself confirmed in writing on multiple occasions spanning more than a year that modification, deferral, rate reduction, and maturity extension are available options on Debtors' account, while simultaneously representing through other communications that no options exist. The purpose of this Chapter 11 is to reorganize Debtors' financial affairs, address all obligations through a confirmable plan of reorganization, and — with respect to the mortgage — request referral to the Court's Mortgage Modification Mediation Program, through which Debtors seek a structured forum to present SPS's own written representations regarding available options and pursue a negotiated resolution. At minimum, Debtors seek cure and reinstatement of the loan on its original terms pursuant to 11 U.S.C. § 1124(2), which SPS cannot block upon plan confirmation. Whether through a negotiated modification or a confirmed plan providing for cure and reinstatement, this Chapter 11 provides the legal framework to preserve the Property and resume performance.

Debtors are actively interviewing bankruptcy counsel and have no intention of proceeding through this Chapter 11 case without representation. As represented in the concurrently pending Motion to Extend Schedules Deadline, retention of counsel is in process. This Motion is filed pro se solely because the June 21 statutory deadline does not permit delay while that retention is completed.

## II. JURISDICTION, VENUE, AND STATUTORY BASIS

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G). Venue is proper in this District pursuant to 28 U.S.C. § 1408.

2. Debtors filed a voluntary Chapter 11 petition on May 22, 2026. This case is pending as Case No. 2:26-bk-05144-MCW before the Honorable Madeleine C. Wanslee, Chief Judge.

3. Debtors had one prior bankruptcy case, Case No. 2:25-bk-07596-PS (Chapter 13, before the Honorable Paul Sala), filed August 14, 2025 and dismissed January 26, 2026 — within one year before the filing of the current case.

4. Under 11 U.S.C. § 362(c)(3)(A), the automatic stay terminates as to Debtors on the 30th day after the filing of the current case — June 21, 2026 — unless this Court enters an order of extension before that date. Because there was only one prior dismissal within the preceding year, § 362(c)(3) governs and the stay did go into effect upon filing on May 22, 2026.

5. Under 11 U.S.C. § 362(c)(3)(B), this Court may extend the stay upon notice and a hearing completed before expiration of the 30-day period, upon a showing by clear and

convincing evidence that the current case was filed in good faith as to the creditors to be stayed.

6. Under 11 U.S.C. § 362(c)(3)(C), a case filed within one year of a prior dismissal carries a rebuttable presumption of bad faith. The specific statutory factors are addressed in Section V, and clear and convincing evidence rebutting each applicable factor is presented therein.

### III. THE PROPERTY AND THE PRINCIPAL CREDITOR

7. The property at issue is 11440 N. 69th Street, Scottsdale, Arizona 85254 (APN 175-25-028) (the "Property"). The Property is Debtors' primary and sole residence. It is not an investment, rental, or vacation property. It has been the Debtors' home for many years.

8. The Property has been specifically adapted to accommodate the medical needs of Ronald Stephen Owens, who is eighty years old, has lived with Parkinson's disease for twenty-five years, has survived four separate bouts of cancer, carries a cancer diagnosis, and has serious heart disease. Elizabeth Ann Naylor, age sixty-nine, is his primary caregiver and provides daily medical care, medication management, and physical assistance. Their adult daughter, who has autism, also resides at the Property. Displacement from this Property would cause severe disruption to a household organized entirely around the medical needs of an elderly, seriously ill resident.

9. The first deed of trust on the Property is held by SPS as servicer for U.S. Bank Trust Company, National Association, as Trustee for COLT 2024-3 Mortgage Loan Trust (the "Trust"). The Note is in the original principal amount of $1,600,000.00 at a fixed rate of 8.000%, originated April 19, 2024, maturing May 1, 2054. SPS has scheduled a Trustee's

Sale of the Property for July 28, 2026 (Instrument No. 20260099842). A second deed of trust is held by Alliant Credit Union, serviced by Cenlar FSB. Both secured creditors' interests are fully preserved by the automatic stay.

10. The accumulated arrears on the SPS first mortgage obligation, as reflected in SPS's June 1, 2026 payoff statement, are approximately $191,420.90 against a total payoff of $1,760,950.00, accruing at $344.31 per day. As demonstrated in Section V.B below, Debtors' documented monthly income is more than sufficient to service the ongoing contractual payment and to fund a plan cure of the arrears over a reasonable term. The arrears represent the entirety of the financial obstacle in this case.

## IV. THE PRIOR CHAPTER 13 CASE: THE RECORD OF GOOD FAITH AND THE CAUSES OF DISMISSAL

The § 362(c)(3)(C) presumption of bad faith requires a particularized inquiry into the circumstances of the prior dismissal. Here, that inquiry leads to a clear conclusion: Debtors acted in good faith at every stage. They filed for legitimate reasons, communicated consistently and in writing with counsel, asked for specific actions to be taken, and were prepared to provide the documents the Trustee required. The case was dismissed not because Debtors refused to perform, but because prior counsel did not respond to their requests in the days before dismissal and did not file the motions they asked him to file.

### A. Why Debtors Filed the Prior Chapter 13 Case.

11. Debtors filed Case No. 2:25-bk-07596-PS on August 14, 2025 to reorganize their financial affairs, address obligations to unsecured creditors through a confirmed plan, and

pursue a negotiated modification of the mortgage through the Court's Mortgage Modification Mediation Program ("MMM Program"). At the time of filing, no foreclosure sale had been scheduled, and the mortgage arrearage was relatively modest. The dominant financial burden was the mortgage's interest rate — 8.000% fixed on a $1,600,000 note originated in April 2024 — and the need for a structured forum in which SPS could be required to participate in a good-faith modification evaluation.

12. Beginning in late 2024, following SPS's Demand Notices of November and December 2024 and April 21, 2025, Elizabeth Ann Naylor made multiple direct contacts with SPS by telephone seeking loss-mitigation assistance. On each call she was told the account was ineligible for any options — no modification, no forbearance, no next steps. When she attempted to submit an application through SPS's own online portal, the portal returned the message: 'Your account is not eligible for this functionality. Please call us.' SPS had blocked access to the loss-mitigation application process both by telephone and through its own servicing portal.

13. On April 28, 2025, Elizabeth Ann Naylor submitted a formal hardship letter to SPS documenting the household's medical and financial circumstances and requesting loss-mitigation assistance. On April 29, 2025, Debtors filed CFPB Complaint No. 250429-20442264, documenting SPS's refusal to engage through any channel, the portal blockage, and the telephone denials. The delinquency at that time was approximately $24,000. On May 12, 2025, SPS responded to the CFPB certifying that no loss-mitigation resolution was available on this account and that no error had occurred in its servicing.

14. On May 21, 2025, Elizabeth Ann Naylor sent SPS a formal written demand letter citing RESPA violations and demanding that SPS produce the specific investor restriction provision it had repeatedly cited as the basis for its refusals. SPS did not produce it.

15. In May 2025, Debtors also engaged NACA, a HUD-approved housing counseling organization, to assist with loss-mitigation outreach to SPS. NACA separately confirmed that SPS had failed to follow established loss-mitigation protocols on this account.

16. Despite all of these contacts — direct telephone calls, a formal hardship letter, a CFPB complaint, a formal RESPA demand letter, and engagement of a HUD-approved counselor — every live contact with SPS produced the same response: no options existed, the investor would not permit modification under any circumstances, and there was nothing SPS could do. This position was irreconcilable with SPS's own written correspondence sent to the same borrowers at the same address during the same period. On June 9 and June 12, 2025 — while SPS was telling Debtors on every direct contact that no options existed — SPS mailed written letters representing that it 'offers many assistance options' and inviting Debtors to call to discuss those options. On August 18, 2025 — four days after the Chapter 13 filing — SPS mailed a letter specifically listing as currently available on this account: modification, 'a reduction of your interest rate, a partial payment deferral or an extension to the maturity date of your mortgage loan.'

17. SPS had certified to the CFPB on May 12, 2025 that no options existed. It had told Debtors the same on every direct contact. It was simultaneously mailing letters to the same address describing specific modification and deferral options as currently available on this account. That contradiction — a written record of available options on one hand, and a consistent verbal and regulatory denial on the other, never explained and never reconciled —

is precisely why the MMM Program was the only viable path forward. Filing the Chapter 13 was a good-faith effort to access that structured forum and reorganize all obligations.

**B. The Trustee's December 8, 2025 Recommendation Identified Correctable Conditions — Not Fatal Defects — and Expressly Stated the Plan Could Be Confirmed.**

18. On December 8, 2025, the Chapter 13 Trustee filed a Trustee Evaluation and Recommendation Report (the "Trustee's Recommendation") in Case No. 2:25-bk-07596-PS, identifying eleven items requiring attention before plan confirmation. The Trustee's Recommendation expressly stated: "the Plan can be confirmed subject to the condition(s) noted above, adequate funding, and timely filed Stipulated Order Confirming, and Court approval." This was not a recommendation that the case be dismissed outright. It was a conditional confirmation roadmap — a statement that the plan was confirmable if the identified conditions were met. The items identified included: resolving the Arizona Department of Revenue's plan objection (item 1); reconciling proof of claim amounts with the plan treatment (item 2); filing unfiled 2023 and 2024 federal and state tax returns (item 3); providing bank account statements (item 4); curing plan payment delinquency (item 5); submitting 2024 tax returns and supporting documents (item 7); demonstrating plan feasibility (item 8); documenting LLC valuations (item 10); and explaining the schedule B omissions (item 11). Items 1, 2, 3, 7, 9, 10, and 11 required attorney action or coordination — filing objections to claims, preparing and filing a stipulated order, resolving the ADOR objection, and submitting a fee application. Debtors could not perform those tasks without counsel.

19. With respect to item 3 — the unfiled 2023 and 2024 tax returns — this issue arose because Elizabeth Ann Naylor, as Ronald Owens's full-time caregiver, had been unable to compile and submit the required financial information during the period of his most serious medical decline. On January 22, 2026 — four days before dismissal — Elizabeth Ann Naylor's written communication to prior counsel specifically stated that her tax preparer was standing by to receive information and that she was actively compiling what she could as quickly as possible. Debtors were not ignoring the tax return requirement. They were working to address it and informed counsel of that in writing. The 2023 and 2024 federal and state tax returns have now been completed.

20. With respect to item 8 — plan feasibility — the Trustee's Recommendation noted that Debtors' Schedules I and J, as filed by prior counsel, reflected disposable income of only $14,443 per month against plan payments of $15,600 per month. That gap of $1,157 per month was the result of a discrepancy between Debtors' actual income and the income reflected in the schedules as filed by approximately $6,640 per month. Debtors' actual documented monthly income — consisting of two lifetime AFTRA pensions and two Social Security benefits, all fully verifiable by benefit letters — is $21,083 per month, as set forth in Section V.B below. A plan built on accurate income figures would have been feasible. The infeasibility reflected in the Trustee's Recommendation was a drafting error in counsel's schedules, not a reflection of Debtors' actual financial capacity.

**C. Debtors Retained Separate Real Estate Counsel Because Bankruptcy Counsel Acknowledged He Was Not Expert in Negotiating with Mortgage Servicers.**

21.    Debtors retained prior bankruptcy counsel  to file the Chapter 13 case, who acknowledged to Debtors that his practice did not specialize in negotiating directly with mortgage loan servicers. Because that expertise was essential to pursuing the modification track, Debtors separately retained a real estate attorney specifically to engage SPS on loss mitigation and to work in coordination with bankruptcy counsel toward the MMM referral. Debtors were simultaneously compensating two attorneys because they were committed to exhausting every available option.

22.    The separately retained real estate counsel engaged SPS directly and extensively from September 2025 through January 2026, making documented contact across multiple SPS departments and representatives — including SPS's own bankruptcy litigation counsel, Leonard J. McDonald, Esq. of Tiffany & Bosco, P.A. — specifically on the question of whether the investor would permit modification. SPS's response across every contact was identical: no modification was available, and the investor would not permit it under any circumstances. No provision was cited. No documentary support was produced.


**D.    Prior Bankruptcy Counsel Failed to File the MMM Motion Despite Debtors' Express Written Requests.**

23.    Debtors asked prior bankruptcy counsel in writing, on multiple occasions, to file the formal MMM referral motion. On September 25, 2025, Elizabeth Ann Naylor sent a written email to prior bankruptcy counsel expressly requesting that he file the MMM motion so that SPS would be compelled through the court process to engage — regardless of what SPS had said informally. Prior bankruptcy counsel responded in writing the same day. His stated reason for declining was that because SPS had already said no, filing the MMM motion

would be "probably a waste of time and energy. And money." He indicated he would consult further with the real estate attorney and advise. He did not file the motion. The real estate attorney also did not file it. The MMM referral that was a major reason for the Chapter 13 filing was never submitted during the entire pendency of the case.

**E.  The Trustee Filed a Notice of Intent to Dismiss on January 13, 2026. Prior Counsel Did Not File an Objection or Motion to Extend Time, and Did Not Respond to Debtors' Written Requests Made Four Days Before Dismissal.**

24.     On January 13, 2026, the Chapter 13 Trustee filed a Notice of Intent to Lodge Dismissal Order and Certificate of Mailing, providing ten days' notice of intent to lodge a dismissal order in Case No. 2:25-bk-07596-PS. Prior bankruptcy counsel received that notice. Thirteen days elapsed between that notice and the January 26 dismissal — thirteen days in which prior counsel could have filed an objection, a motion to extend time, or any other responsive pleading. He filed nothing.

25.     On January 22, 2026 — four days before dismissal — Elizabeth Ann Naylor sent written communications to both prior bankruptcy counsel and his paralegal, Mary Vigil. Those communications specifically asked: (a) whether prior counsel could file an objection to the Trustee's motion to dismiss; (b) how much time such an objection would create; (c) whether he would refile the case if it were dismissed; and (d) what documents were needed to proceed. She simultaneously informed counsel that her tax preparer was standing by and that she was actively compiling the financial documentation the Trustee had identified. This written communication was sent to both prior counsel and his paralegal directly and constituted an express, specific, written request for counsel to take action.

26. Prior bankruptcy counsel did not respond to that written request before the January 26, 2026 dismissal. On January 26 (the day of dismissal), his paralegal replied to say that counsel would respond to the email. On January 27, Debtors followed up again: they had still not heard from him. On January 28, 2026 — two days after the case had been dismissed — the paralegal transmitted the dismissal order and stated that counsel would respond when he could. The paralegal's explanation for the non-response was that counsel receives "100s and 100s" of emails daily and his calendar had been back-to-back.

27. No objection to the Trustee's motion to dismiss was filed. No motion to extend time was filed. No response of any kind was filed on behalf of Debtors between January 13, 2026 — when the Trustee gave notice of intent to dismiss — and January 26, 2026 — when the dismissal order was entered. The dismissal order itself states: "As of the date of this Dismissal, no current Motions to Extend Time appear on the Court Docket and these item(s) have not been addressed." This absence was not a strategic decision by Debtors — it was the direct result of prior counsel's failure to respond to their written requests and to take the actions they asked him to take.

**F. The Arrears Accumulated During the Pendency of the Prior Case as a Consequence of the Private Negotiation Track Counsel Pursued in Lieu of Filing the MMM Motion.**

28. The arrears that now stand at $191,420.90 did not exist in anything close to that amount at the time of the prior filing in August 2025. They accumulated during the pendency of the Chapter 13 case while the separately retained real estate counsel pursued direct, private negotiation with SPS toward a modification agreement — an approach prior bankruptcy counsel had chosen in lieu of filing the formal MMM motion. Debtors deferred regular

mortgage payments during that period in anticipation of a negotiated resolution. SPS refused to reach any resolution. The formal MMM motion that would have initiated court-supervised mediation was never filed. The private negotiation track produced no agreement and no result. The mortgage arrears accrued at $344.31 per day throughout.

29. The current arrears are not evidence of an inability to pay. They are the financial consequence of a year-long process in which the formal legal mechanism designed to resolve exactly this dispute was never invoked — because prior counsel declined to invoke it. That mechanism is available in this Chapter 11, and Debtors intend to invoke it as one of their first substantive filings upon retention of counsel.

**G.    After Dismissal, Prior Counsel Declined to Refile and Provided No Meaningful Assistance.**

30. Following the January 26, 2026 dismissal, Debtors continued attempting to communicate with prior bankruptcy counsel through February and March 2026, seeking either a refiling of the case or a referral to replacement counsel. Counsel declined to refile. When asked for a referral to another attorney who could handle the matter, Debtors were told that counsel did not have anyone to recommend and that they could search the internet for bankruptcy attorneys in their area. Debtors were left without representation, without a referral, and without any transition assistance, facing an active foreclosure on their primary residence.

31. The Chapter 13 Trustee's Final Report and Account, filed in Case No. 2:25-bk-07596-PS, confirms that the case was filed on August 14, 2025 and dismissed on January 26, 2026, with only one month of payments received from Debtors and disbursed

entirely to the SPS mortgage obligation. The Final Report confirms that the plan was never confirmed. The plan's failure to reach confirmation — despite the Trustee's own statement that it could be confirmed — was the direct result of prior counsel's failure to address the identified conditions, file the required submissions, and respond to the Trustee's notice of intent to dismiss.

## V.  THE CURRENT CASE IS FILED IN GOOD FAITH: CLEAR AND CONVINCING EVIDENCE

Section 362(c)(3)(C) identifies specific indicia of bad faith. None of those indicia is attributable to Debtors' conduct. The § 362(c)(3)(C) presumption factors, to the extent any apply, are addressed in the factual record set forth in Section IV above — a record that establishes by clear and convincing evidence that the circumstances giving rise to the prior dismissal were outside Debtors' control and are not attributable to bad-faith conduct. The following affirmative showings, supported by the documentary record available upon request and by the Declarations of Debtors filed herewith, establish good faith by clear and convincing evidence.

### A.  This Case Is Filed for a Legitimate and Distinct Reorganization Purpose.

32.      This case is filed under Chapter 11. Unlike the prior Chapter 13, Chapter 11 is not subject to the same plan-term constraints, trustee-controlled conduit payment structure, or confirmed-plan confirmation requirements that made the prior case vulnerable to administrative dismissal. Chapter 11 provides Debtors the tools to propose a plan directly, address all obligations including unsecured creditors, and pursue a court-supervised

modification process without the structural limitations of Chapter 13. The change in chapter reflects a deliberate and considered determination, not a repetition of the prior case.

33. Debtors intend to file a Motion for Mortgage Modification Mediation in this case. The MMM Program brings both parties to a structured, court-supervised forum in which they are expected to participate in good faith. It does not guarantee an agreement, but it does provide a forum for engagement — the one thing SPS has consistently refused to provide outside of court supervision. SPS's own written correspondence, as detailed in Section V.C below, describes modification, partial payment deferral, rate reduction, and maturity extension as presently available on this account. The MMM Program is the appropriate forum to hold SPS to those representations.

34. In the alternative, and at minimum, Debtors intend to propose a Chapter 11 plan of reorganization providing for cure and reinstatement of the SPS first mortgage on its original contractual terms pursuant to 11 U.S.C. § 1124(2). Cure and reinstatement is a right that SPS cannot block upon proper plan confirmation and funding. It is the floor of what this reorganization can achieve, not the ceiling. The income analysis in Section V.B demonstrates that a plan providing for full cure and reinstatement is arithmetically feasible.

35. This is not a serial filing for delay. There was only one prior bankruptcy — Case No. 2:25-bk-07596-PS — dismissed January 26, 2026. Approximately four months elapsed between that dismissal and the filing of this case on May 22, 2026. During that period, Debtors were attempting to resolve the mortgage dispute directly with SPS, were actively seeking to retain new bankruptcy counsel, and were managing a household in which one spouse is disabled and requires a high level of care. The current filing was precipitated by SPS's scheduling of the Trustee's Sale — originally for May 26, 2026, the same week as the

filing — leaving Debtors no alternative other than a new petition to preserve the Property while the reorganization process is pursued.

**B. Debtors Have Stable, Documented, Pension-Based Income That Demonstrates Plan Feasibility — and Corrects the Prior Schedule's Understatement.**

36.    As noted in Section IV.B above, the prior Chapter 13 Schedules I and J, as prepared by prior counsel, reflected disposable income of only $14,443 per month — a figure that understated Debtors' actual income by approximately $6,640 per month. That understatement was the source of the Trustee's item 8 feasibility concern. It was a schedules-preparation issue, not a reflection of Debtors' actual financial capacity.

37.    Debtors' actual income consists entirely of lifetime defined-benefit pension payments from the American Federation of Television and Radio Artists (AFTRA) pension plan, and Social Security benefits — sources that are fixed, guaranteed, and not subject to termination, market risk, employer discretion, or reduction for any reason other than death, which is itself mitigated by the joint-and-survivor elections described below. The following table reflects Debtors' actual documented monthly income, supported by benefit letters available upon request:

| Income Source | Monthly (Documented) |
|---|---|
| Ronald S. Owens — AFTRA Pension (lifetime, joint & survivor) | $12,686.00 |
| Ronald S. Owens — Social Security | $3,664.00 |
| Elizabeth A. Naylor — AFTRA Pension (lifetime, joint & survivor) | $2,730.00 |
| Elizabeth A. Naylor — Social Security (net of Medicare) | $2,003.00 |
| **TOTAL DOCUMENTED MONTHLY INCOME** | **$21,083.00** |

38. Both AFTRA pension elections were made on a 100% joint-and-survivor basis. In the event of Ronald Owens's death, Elizabeth Ann Naylor continues to receive his full pension benefit as surviving spouse. Additionally, as surviving spouse, Elizabeth Ann Naylor would receive Ronald Owens's Social Security benefit in lieu of her own, as it is the higher of the two amounts. The income stream supporting this reorganization does not terminate at Ronald Owens's death — it continues through Elizabeth Ann Naylor at a level sufficient to service the contractual first mortgage payment through the life of the note to May 1, 2054.

39. In the event of Elizabeth Ann Naylor's death, Ronald Stephen Owens continues to receive his own AFTRA pension of $12,686.00 per month and Social Security of $3,664.00 per month — a combined income of $16,350.00 per month which itself exceeds the monthly mortgage payment of $12,439.21. The plan is feasible regardless of which spouse survives.

40. The all-in monthly mortgage payment on the first mortgage, as reflected on SPS's most recent statement, is $12,439.21. Documented monthly income of $21,083.00 exceeds that payment by $8,643.79 per month. Ronald Owens's AFTRA pension alone — $12,686.00 per month — exceeds the full monthly first mortgage payment. The ongoing mortgage payment is demonstrably within means. As an illustrative plan cure analysis: if the full arrears of $191,420.90 were cured over 60 months, the monthly cure payment would be approximately $3,190.35 — for a combined monthly housing obligation of approximately $15,629.56, which is $5,453.44 less than documented monthly income of $21,083.00. That remaining $5,453.44 per month is available to fund living expenses and distributions to unsecured creditors under the plan. The plan is feasible on these numbers. The Trustee's prior feasibility concern was a function of understated schedules, not an accurate picture of this household's financial capacity.

**C. SPS's Own Written Communications — Spanning More Than Fourteen Months — Confirm That Loss-Mitigation Options Exist on This Account and That Court-Supervised Participation Is Necessary.**

41. From the time SPS assumed servicing of this loan in mid-2024 through the filing of this case, SPS communicated in two irreconcilable voices on the same question: whether modification options were available on this account. Through its live representatives — responding to Debtors' direct calls, Debtors' attorneys, a HUD-approved housing counselor, and a federal regulatory agency — SPS consistently stated that no modification options existed and that the investor would not permit modification under any circumstances. Through its own written correspondence, sent on SPS letterhead to these same borrowers about this same account during the same period, SPS repeatedly stated the opposite.

42. The contradictory written communications are documented in sequence as follows. On May 12, 2025, SPS submitted a written response to the Consumer Financial Protection Bureau certifying that no loss-mitigation resolution was available on this account and that no error had occurred in its servicing. On June 9 and June 12, 2025 — within weeks of that certification — SPS sent written letters to Debtors stating that it 'offers many assistance options' and inviting them to call to discuss those options. On August 18, 2025 — four days after the Chapter 13 filing — SPS sent a written letter listing as currently available on this account: modification, 'a reduction of your interest rate, a partial payment deferral or an extension to the maturity date.' On January 30, 2026 — four days after the Chapter 13 dismissal — SPS sent a written letter stating that 'there are options available to help resolve the default and avoid foreclosure.' On February 24, 2026, SPS sent written notice announcing

a foreclosure sale date. Three days later, on February 27, 2026, SPS sent a written letter stating that it 'offers many assistance options' including 'modifications or account settlement alternatives.' On May 28, 2026 — five days after the filing of this Chapter 11 case, with full knowledge of the pending bankruptcy — SPS sent a written communication expressly describing the following as currently available on Debtors' account: 'Modification — We may be able to provide you with a more affordable monthly payment by making changes to the terms of your mortgage loan. These changes may include a reduction of your interest rate, a partial payment deferral or an extension to the maturity date of your mortgage loan.'

43. The May 28, 2026 letter contained two additional representations of significance. First, it stated that 'the terms of the mortgage remain in effect' — language that incorporates every provision of the Security Instrument authorizing extension, modification, forbearance, and accommodation, made with full knowledge of the pending bankruptcy. Second, it stated that SPS 'will not proceed with foreclosure' while Debtors are on a repayment plan — a written acknowledgment that SPS has authority to halt the foreclosure through a negotiated loss-mitigation arrangement.

44. The same May 28 letter represented that SPS participates in the U.S. Treasury Home Affordable Modification Program (HAMP). HAMP was permanently closed to new applicants on December 31, 2016 — nearly a decade before that letter was sent. This and other materially inaccurate representations about available programs have been addressed in a Notice of Error and Request for Information served on SPS pursuant to 12 C.F.R. §§ 1024.35 and 1024.36, which is part of the record of this matter and is available upon request.

45. The pattern documented above — a CFPB certification that no options existed, followed within weeks by letters describing specific options as available; a foreclosure notice

followed three days later by a letter offering modifications; and a written description of deferral as currently available sent five days after the Chapter 11 filing — has never been explained, acknowledged, or reconciled by SPS. It demonstrates precisely why referral to the Court's Mortgage Modification Mediation Program is warranted. The MMM Program does not guarantee an agreement. It does provide a structured, court-supervised forum in which SPS is expected to engage in good-faith evaluation of the options its own correspondence describes as available. That evaluation has never occurred. This Chapter 11 is the vehicle to pursue it.

## VI.  EXTENSION OF THE STAY CAUSES NO COGNIZABLE PREJUDICE TO CREDITORS

46.    SPS's secured interest in the Property remains fully intact and fully protected under the automatic stay. The stay does not diminish SPS's lien, reduce its claim, or impair its right to seek relief from the stay pursuant to 11 U.S.C. § 362(d) at any time upon the required showing. The second deed of trust held by Alliant Credit Union and serviced by Cenlar FSB is equally protected. No creditor sustains any cognizable prejudice from an extension of the stay. Extension preserves the reorganization process as the forum in which all creditors' rights are addressed — it does not foreclose them.

47.    The alternative — stay termination on June 21, 2026, followed by Trustee's Sale on July 28, 2026 — permanently terminates this reorganization and forecloses any possibility of the court-supervised loss-mitigation process that SPS's own correspondence confirms is warranted. A $1,760,950 property is sold on the basis of arrears of $191,420.90 against borrowers with documented monthly income of $21,083.00 and the demonstrated ability to

service the ongoing payment — because their prior attorneys did not file a motion that was available to be filed and that Debtors specifically requested in writing. Section 362(c)(3)(B) exists precisely to preserve the reorganization process for good-faith re-filers whose prior dismissal was not of their own making. This is that case.

## VII.  RELIEF REQUESTED

For the foregoing reasons, Debtors respectfully request that this Court enter an order:

(a) Extending the automatic stay pursuant to 11 U.S.C. § 362(c)(3)(B) as to all creditors for the duration of this Chapter 11 case, or until further order of the Court;

(b) Setting this Motion for hearing on an expedited basis, to be completed before June 21, 2026, pursuant to the concurrently filed Motion for Expedited Hearing; and

(c) Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: June 6, 2026

/s/  Ronald Stephen Owens
RONALD STEPHEN OWENS
*Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254

/s/  Elizabeth Ann Naylor
ELIZABETH ANN NAYLOR
*Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254

**JOINT DECLARATION OF ELIZABETH ANN NAYLOR AND RONALD STEPHEN OWENS IN SUPPORT OF EMERGENCY MOTION TO EXTEND AUTOMATIC STAY**

We, Elizabeth Ann Naylor and Ronald Stephen Owens, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. We are Debtors-in-Possession in Case No. 2:26-bk-05144-MCW. We have personal knowledge of all facts stated in this Declaration.

2. We have lived at 11440 N. 69th Street, Scottsdale, Arizona 85254 for five years. This is our primary and sole residence. The home has been adapted to accommodate Ronald's medical needs. Ronald is eighty years old, has lived with Parkinson's disease for twenty-five years, has survived four separate bouts of cancer, carries a current cancer diagnosis, and has serious heart disease. Elizabeth Ann Naylor, age sixty-nine, is his primary caregiver and provides his daily medical care, medication management, and physical assistance. Our adult daughter, who has autism, also lives in the home.

3. We filed Case No. 2:25-bk-07596-PS, a Chapter 13 bankruptcy, on August 14, 2025 to reorganize our financial affairs, address our unsecured obligations through a plan, and pursue a mortgage modification through the Court's MMM Program. At the time of filing, no foreclosure sale was scheduled and the mortgage arrearage was relatively modest. The dominant financial burden was the mortgage's interest rate. Prior to filing, we had attempted to reach SPS through personal calls, a HUD-approved counselor (NACA), and SPS's own online portal — which told us our account was "not eligible for this functionality." SPS was simultaneously mailing us letters saying options were available while telling us on every call that no options existed.

4. Because our bankruptcy counsel acknowledged at the outset that he was not experienced in negotiating with mortgage servicers, we separately hired a real estate attorney

specifically to engage SPS on modification and to coordinate with bankruptcy counsel toward an MMM referral.

5.      On September 25, 2025, Elizabeth Ann Naylor sent a written email to prior bankruptcy counsel asking him to formally file the MMM motion so that SPS would be compelled through the court process to participate, regardless of what SPS had said informally. He responded in writing the same day and declined, stating that because the lender had said no, filing would probably be a waste of time and energy and money. He did not file the motion. The MMM referral was never filed during the entire Chapter 13 case.

6.      The Chapter 13 Trustee issued a Recommendation on December 8, 2025 identifying items that needed to be addressed before the plan could be confirmed. The Trustee expressly stated the plan could be confirmed subject to those conditions. Several items required attorney action — filing claim objections, submitting an amended plan, resolving the ADOR objection, and lodging the stipulated confirming order. We asked prior counsel for guidance on how to address those requirements and what steps needed to be taken.

7.      With respect to the unfiled 2023 and 2024 tax returns: Elizabeth Ann Naylor, as Ronald's full-time caregiver, had been managing his daily medical needs, medications, appointments, and household responsibilities on her own. The time required to coordinate with a tax preparer had not been available given those demands.  On January 22, 2026, she specifically informed prior bankruptcy counsel in writing that our tax preparer was standing by and that she was actively compiling what she could as quickly as possible. The 2023 and 2024 federal and state tax returns have now been completed.

8.      The arrears grew substantially during the pendency of the Chapter 13 case. We deferred regular mortgage payments during this period because our real estate attorney was

pursuing direct negotiations with SPS toward a modification, and we understood that modification discussions typically involve a temporary deferral of payment while negotiations are conducted. SPS refused to reach any resolution despite our attorneys' documented contacts with multiple SPS departments and with SPS's own bankruptcy counsel.

9. On January 13, 2026, the Trustee filed a Notice of Intent to Lodge Dismissal Order giving ten days' notice. On January 22, 2026 — four days before the dismissal — Elizabeth Ann Naylor sent written emails to both prior bankruptcy counsel and his paralegal, Mary Vigil, specifically asking: (a) whether he could file an objection to the Trustee's motion to dismiss; (b) how much time that would create; (c) whether he would refile if dismissed; and (d) what documents were needed. She informed him our tax preparer was standing by. Prior bankruptcy counsel did not respond before the January 26, 2026 dismissal. His paralegal replied on January 26 to say he would respond. On January 27, we followed up again. On January 28, two days after dismissal, the paralegal sent the dismissal order and said he would respond when he could.

10. No objection or motion to extend time was filed. The case was dismissed on January 26, 2026. After dismissal, we continued trying to reach prior counsel through February and March 2026. He declined to refile. When we asked for a referral, he told us he had no one to recommend and that we could search the internet. We were left without representation facing an active foreclosure on our primary residence.

11. Our income consists entirely of lifetime AFTRA pension payments and Social Security benefits. Ronald receives a lifetime AFTRA pension of $12,686.00 per month and Social Security of $3,664.00 per month. Elizabeth receives a lifetime AFTRA pension of

$2,730.00 per month and Social Security of approximately $2,003.00 per month net of Medicare withholding. Our total documented monthly income is $21,083.00. Ronald's AFTRA pension alone — $12,686.00 per month — exceeds the monthly mortgage payment of $12,439.21. Both pensions were elected on a 100% joint-and-survivor basis, meaning the survivor continues to receive the deceased spouse's full pension benefit. Ronald's AFTRA pension alone — $12,686.00 per month — exceeds the monthly mortgage payment of $12,439.21.

12.     The prior Chapter 13 Schedules I and J reflected monthly disposable income of $14,443. That figure was not accurate. It understated our actual income by approximately $6,640 per month.

13.     We filed the current Chapter 11 case on May 22, 2026 in good faith, to reorganize our financial affairs and pursue the modification process that the prior case was designed to access. We are committed to retaining bankruptcy counsel at the earliest possible opportunity and to complying with all obligations as Debtors-in-Possession.

Respectfully submitted,

Dated: June 6, 2026

/s/  Ronald Stephen Owens
RONALD STEPHEN OWENS
*Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254

/s/  Elizabeth Ann Naylor
ELIZABETH ANN NAYLOR
*Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on this 6th day of June, 2026, a copy of the foregoing was served via first class mail upon the following:

Jennifer A. Giaimo, Esq.
Office of the United States Trustee
230 N. First Avenue, Suite 204
Phoenix, AZ 85003

Shellie Labell, Esq.
Robertson, Anschutz, Schneid, Crane & Partners, PLLC
Attorneys for U.S. Bank Trust Company, N.A., as Trustee for COLT 2024-3
13010 Morris Road, Suite 450
Alpharetta, GA 30004

Leonard J. McDonald, Esq.
Tiffany & Bosco, P.A.
Attorneys for Alliant Credit Union
1850 N. Central Avenue, 24th Floor
Phoenix, AZ 85004

*By:*
/s/  Ronald Stephen Owens
RONALD STEPHEN OWENS
*Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254

/s/  Elizabeth Ann Naylor
ELIZABETH ANN NAYLOR
*Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254